AN OPEN LETTER

On August 27, 2008, seven months after Chief Judge Carol Jackson denied my request for an evidentiary hearing on her Order to Show Cause why my law license should not be suspended for successfully and ethically protecting my client, Irene Green, from losing her home in foreclosure, an order was entered by the United States District Court of the Eastern District of Missouri. That order did not respond to my request for additional time to present extensive evidence in the absence of an evidentiary hearing, but was one entered, sua sponte, suspending my license based solely on the fetid order of the Missouri Supreme Court. As such, the District Court order is in direct contravention of federal statute and the explicit dictates of the United States Supreme Court as they pertain to attorney discipline in federal courts.

In light of past conduct, the order should not have come as a surprise. This process has been tainted from the beginning; nothing less than vindication for the embarrassing defeat of a law firm who believed might would succeed over right. Opposing counsel, prosecutor and so-called triars of fact, have traded ethical conduct for personal ambition- leaving a shameful stain on the cloak of this system.

That being said, however, I must agree with the final result of this debacle, the suspension of my law license. Anyone so blinded by the need of another human being as to expect human decency in return and so naïve as to believe opposing counsel and triars of fact will view and weigh the evidence at hand and act in an ethical, fair and unbiased manner, has no place in the practice of law. That entitlement should be reserved for those astute enough to recognize that elevation in position does not guarantee elevation of character. That I failed to do.

Disregarding both the Federal Rules of Civil Procedure as they apply to the manner in which attorney disciplinary proceedings are to considered, and my explicit allegations regarding the gross improprieties of the proceedings before the Missouri Bar and the Missouri Supreme Court, the United States District Court of the Eastern District of Missouri chose to ignore my Motion for Hearing and denied my right to present evidence and establish, by an overwhelming weight of evidence, the biased and unsupported suspension of my law license by the Missouri Supreme Court.

The decision of the U.S. District Court to, not only deny my right to a hearing but to completely ignore it, is a tacit admission of the abuse of power exercised by the Missouri Supreme Court. Putting my evidence on the record, and the prosecutor's lack thereof, would have shed light on the brazen injustice of the state court order suspending my license – one in which the Missouri Supreme Court did not and could not support with a scintilla of evidence, nor with a written opinion. Instead, it relied on the unlikelihood that the biased order would be reviewed by the United States Supreme Court – the only entity to which the US Constitution grants review.

Granting my request for a hearing would have produced evidence on the record that revealed that Alan Pratzel, the now Chief Disciplinary Counsel of the Missouri Bar, appointed by the Missouri Supreme Court while prosecuting my case and following the sudden "resignation" of his predecessor, actually lied in his oral argument before the Missouri Supreme Court about one of the most critical points of my case. (Lacking evidence to support his mission of my disbarment, winning demanded his knowing deceit.)

Allowing my evidence would have disclosed that Pratzel and members of the hearing panel failed to notice that more than twenty documents were missing during their purported review of the evidence; evidence never reviewed during the hearings.

It would have revealed that the Hearing Panel and the Missouri Supreme Court ignored the eight summarized pages of documented lies on the part of the Complainant, Irene Green, as well as her defrauding the US Bankruptcy Court, the IRS, the Missouri Department of Revenue and the Missouri Department of Social Service.

Allowing evidence would have shown that through eight depositions, numerous disciplinary hearings, and over a hundred documents presented, not a solitary lie or inconsistency on my part could be sited; a point I emphasized on the record following an off the record attempt of the Chief Hearing Office to intimidate me with a clearly erroneous application of Missouri's redemption law as well as his *unsuccessful* attempt to claim I was not credible.

Although directed by federal statute to make its own findings, The District Court's order finds its justification in the State's disciplinary hearings, which not only were defective in process, but were grossly inadequate in time - much of which was allotted to the chicanery of a recalcitrant complainant. Having unsuccessfully combed through extensive records for months seeking a basis for discipline, Alan Pratzel's battle plan evolved into overwhelming the process by filing a 93 paragraph Information – the longest the Chief Hearing Officer had seen in his then 17 years as a member of the Missouri Bar Disciplinary Panel. Failing in that effort, Pratzel then resorted to omitting documents, engaging in ex parte communications, trickery, offering false testimony and ultimately lying to the Missouri Supreme Court.

An even greater indictment on the disciplinary system is the manner in which the flagrant disregard of the rules of ethics by opposing counsel was completely swept under the rug. Although documents and deposition of their own client disclosed serious violations, to date, no measures have been taken by the Office of the Chief Disciplinary Counsel to even investigate their actions, let alone impose discipline.

Despite the uncontroverted lack of veracity of the Complainant, an element necessary for a finding of fraud, the Missouri Supreme Court reached the implausible conclusion that I had defrauded my client. Despite saving her home at 4950-52 Waterman, from imminent foreclosure, the Supreme Court suspended my license because of the "stress" I purportedly caused her.

Despite presenting Bankruptcy Court orders establishing the fee base for bankruptcy representation, as well as the 132 detailed entries chronicling the reasonable time expended on the Complainant's case, - none of which was billed to the Complainant until after the client's breach of trust and duty, there was still a finding of excessive fees.

Despite more than a hundred state, federal, bankruptcy and local rules related to Complainant's bankruptcy, foreclosure, and real estate transactions, not one violation of a single rule could be cited.

Significantly, not once, during any aspect of the proceedings, was the language of any of the rules allegedly violated ever read, cited, reviewed or analyzed.  Not once.

While federal rule gives me the right to appeal the order of suspension to the Eighth Circuit Court of Appeals, it also gave me a right to a hearing on the order to show cause. Likewise, Missouri law gave me the right to a de novo review. That was reduced to fifteen minutes of oral argument.  It has become apparent that this process has little to do with the courts following rules, (federal, state or even those of ethics), but more so with following the dictates of the Powers-That-Be.  Our system of law and justice is broken; it has become a game played by those controlled more by the strings of elitist firms than by the rule of enacted law.   I choose to not engage in a game pre-determined by favoritism and weighed by unjust scales.

Having no intentions of practicing law in the future, I engaged in this process of defending my license only to disclose the misconduct of those parties involved.  I acted on the assumption that my case would be reviewed by principled judges who give greater weight to the nobility of their position than to the pursuit of personal gain. I proceeded on the notion of fairness, truth and justice; that evidence would be reviewed and that greater weight would be given to facts rather than to favoritism.  What was revealed in the four years this matter has been volleyed from one tainted system to the next is the fact that the "good ole boy system" prevails, boasting now to include a few "good ole girls" and two or three flies in the butter milk.

In my 23 years of practicing law numerous qualified African American attorneys were routinely passed over for appointment to the bench.  Those appointed were often treated with less than the respect deserved and graded by members of the Bar with the same fine tooth comb that sought my demise.  African American attorneys have been the subject of discipline almost as frequently as those sworn in.  Solo practitioners fell by the way side unaided by the mere existence of favored partners. I've seen justice manipulated by unethical attorneys and perverted by unethical judges – all while pointing a finger at me.

Rules are written to serve those with sufficient means to elevate others and interpreted artfully when serving those without.   White lawyers found to have lied not once but twice before a court, when associated with large firms, are condoned as "talented young lawyers, full of promise, [who] lost their way among the economic temptations of

modern practice"*, while my truth (and extensive charitable service) is twisted to implicate greed.   *In re: John J. Carey & In re: Joseph P. Danis

During an election year when we see a political convention whose color resembles that of a KKK rally; that flashes back to the days of Emmett Till by airing a commercial that deems a Black man's reference to "lipstick" as being "disrespectful" to a white women who in all other respects is to be treated on the same level as men, when a commercial can be aired reflecting a Black man as the face of CEO's corporate greed, that justifies the possibility of parading an unmarried, pregnant teen through the White House as an example to America's youth, and promotes her mother as a qualified vice-president because she supports her daughter's decision, kills animals and garners millions of dollars of our tax money for her state, there is little wonder I am being hung out as an example of The Missouri Bar's success at self-monitoring.  African American lawyers and solo practitioners are disciplined as examples, while large law firms wreak havoc on us all as the shell game gets played. And the beat goes on.

While I could have appealed this decision to a higher court, to have done so would have been pointless.  My ultimate goal is not to continue to ethically practice law, but to see that law is practiced ethically.  Rather than see yet another court falter in its duty to the citizenry and its obligation to fairness and justice, I choose to believe that nobility indeed exists at some level; that a judge's lofty dream of reaching the US Supreme Court by ruling with the crowd or clicking glasses at a cocktail party is of far less importance and leaves far less a legacy than the honor of upholding the law and the dignity of doing what's right.

I have no intentions of seeking reinstatement of my license now or at anytime in the future.  The process of retiring from law had begun long before this matter began and would have been completed sooner had it not. I choose not to practice law in a system that gives greater weight to the strength of the parties' affiliations than it does to the strength of the evidence it weighs. Having now gone through this process, I exit this phase of my life without regret.  God blessed me with 23 years of practicing law on His terms and He has opened wide a new chapter for my life.  I am well pleased.

Although my interests and dreams have been altered by the mandate of addressing the inequities in this system, a law license is required for neither.  My obligation as an attorney continues on.  I was never defined as a person by the grant of a law license nor am I now by its suspension.

An appeal of the District Court's order at this point would likely do no more than produce a like decision, justified not by the evidence of the case but simply by the artful use of words.  My soul rests well with having ethically and successfully represented my client despite the disgrace of her ingratitude.  Her debase behavior is the least of that seen in this case.

It is with great irony that the callousness of those who sit in judgment across Missouri ultimately took the life of my former client, Charles "Cookie" Thornton and those of six

others.  A man of great caring and faith, Charles was worn down by the continual insensitive disregard for his dignity and legal rights.  By the grace of God, I have been strengthened.  His fate will not be mine.  Instead, I quote here a poem I wrote in honor of a dear friend's installation as Auxiliary Bishop of St. Louis, the now Archbishop of Kansas City, Kansas, The Most Reverend Joseph F. Naumann.  These are the words by which I try to live my life.

"Dear God, my heavenly Father, I come before you
in the name of your Son, Jesus Christ.  I thank you
for your innumerable blessings; the presence of
your Holy Spirit.  On this day may I be used to enrich
the lives of others; that by my compassion they
will know that you are God.

Teach me to speak words that are loving and gentle.
To find moments to encourage those who are lost;
To embrace someone in need of a healing touch;
To share that which I have been so richly blessed.

By your grace may my ears hear the cry of those in need;
My eyes see greatness in the least of those I meet;
My heart welcome those who seek to enter;
My feet walk in the path of my Brother, Jesus.

And by these simple acts of your humble servant,
May all I meet recognize your unchanging love and mercy,
Believe in your unfailing power, and acknowledge the beauty
And sanctity of all human life.

Amen.

While this process has been challenging to say the least, I can only give thanks for an exercise that has increased my inner strength, broadened my thinking and increased my faith. I've been blessed to surrender my fierce independence to reliance on the ever present support of family and friends, people more than eager to help.  While I've been disillusioned by the weakness and miscreant behavior of men and women whom I previously admired, I've met scores of ordinary people who are extraordinarily virtuous.  While my faith in authority has been shattered, my awareness of humanity has not.  With this, I continue to serve the God who created me and to whom we will all answer in the end.

Sincerely,

Christi Fingal Griffin
Attorney at Law

*The following provides insight not only of the improprieties that took place throughout this disciplinary process, but those disregarded by the District Court opinion.

1) On May 29, 2007, the Supreme Court of Missouri, the States highest court, entered an order suspending the license of Movant for three years.[1]  No opinion was entered.[2]

2) The Court's order, addressed none of the constitutional issues raised in Movant's Findings of Facts, Conclusions of Law and Recommendation of Discipline, as well as in Movant's brief and by its silence adopted the Findings of Facts and Conclusions of Law of Informant.

3) Said Findings of Facts and Conclusions of Law were clearly erroneous, not supported by a preponderance of evidence, and in violation of Movant's constitutional rights.

3) The order was based on the factually inaccurate brief and argument of the State's Chief Disciplinary Officer, his false and misleading statements during oral argument[3], involved numerous violations of Supreme Court Rules including multiple provisions of the Code of Professional Conduct and reflected a discriminatory bias displayed throughout the disciplinary process.

---

[1] The disciplinary process was initiated by a complaint conclusively proven to be riddled with false statements.  Said complaint was eventually omitted from the record submitted to the Supreme Court of Missouri by the Office of Chief Disciplinary Counsel and  was substituted with a second complaint containing more generic allegations.  This was one of a long line of improprieties.

[2] The case summary compiled by staff of the Supreme Court was purportedly drawn from briefs of Informant and Movant.  The summary, however exemplifies the bias and discrimination displayed toward Movant throughout the disciplinary process as it was replete with factual inaccuracies, incorrectly and unfairly mischaracterized Movant, and inaccurately and inadequately summarized Movant's position.

[3] One such material false statement was that Movant "shoved the contract in front of the Complainant

4)  Movant was denied a de novo hearing before the Supreme Court of Missouri as provided by law when a recommendation of disbarment of an attorney has been made as in this case, and against prior decisions of the U.S. Supreme Court requiring ample time for an attorney to defend allegations.

5)  Pursuant to Missouri Supreme Court rule, Informant, but not Movant, was given the benefit of a reply brief and oral rebuttal.  Informant used the rebuttal time to raise issues not previously raised and to make false and misleading statements, leaving Movant no time to address newly raised allegations.

6)  Questions posed by members of the Court reflected a lack of familiarity of the record submitted as well as the rules allegedly violated.  The actual language of the rules were disregarded thus failing to give Movant notice of the violations purported committed.

7)  Movant's Motion for Additional Time for Hearing, Motion for Rehearing, Motion for Trial De Novo and Motion for Findings of Fact and Conclusions of Law were all summarily denied.  The Supreme Court of Missouri would not consider a Motion to Suspend Imposition of the Order of Suspension due to its' Rule 84.17 prohibiting post-"trial" motions when no opinion is entered.  No opinion was entered.

8)  The discriminatory manner in which alleged violations of Rules of Professional Conduct are selectively prosecuted in the State of Missouri, and the Missouri Supreme Court Rule providing for motions following a ruling *only* if an opinion is issued, allows the Missouri Supreme Court to summarily foreclose any possible redress of error and to exercise its power in an abusive, selective and discriminatory manner.  The Rooker Feldman doctrine further restricts review.

9)  Movant revealed misconduct on the part of the Disciplinary Hearing Panel

in reaching a recommendation that was neither fair nor supported by the weight of the evidence presented.  Such conduct included but was not limited to:

    a)  The Chief Hearing Officer acknowledged the overwhelming proof of the complainant's gross lack of credibility yet gave weight to the complainant's testimony and necessarily relied on such tainted testimony to make its erroneous and biased findings.  Movant subsequently provided the Supreme Court of Missouri eight pages of contradictions and proven false statements of Complainant. The list was not exhaustive.

    b)  The Chief Hearing Officer attempted to intimidate Movant with threat of disbarment by referencing a so called lack of credibility of Movant based solely on one typographical error in Movant's detailed 103 entry billing statement and upon his own misstatement of Missouri's redemption law.  Indeed, neither Informant's prosecutor nor any member of the hearing panel could sight a single instance of Movant's lack of credibility, inconsistent statement or violation of any of the more than 100 state and federal laws and rules related to Movant's representation of Complainant in bankruptcy or the related sale of her property.

    c)  The Chief Hearing Officer accused Movant of misconduct because Movant "should have represented (Complainant) pro-bono". (Movant has an extensive history of pro-bono work and, in fact, had not charged Complainant for more than 95% of the work performed on her behalf.

    Further, despite loosing income of over $15,000.00 in the first two weeks of representing the Complainant against the fraudulent actions of a purported buyer, Movant had also committed to representing Complainant in a related state court action seeking payment of fees only from the opposing litigant as provided in the opponent's contract with Complainant. Neither Informant nor the Hearing Panel's Findings of Fact and Conclusion of Law stated with specificity how Movant's fees were excessive and, Informant specifically refused to do so when requested.  Movant's detailed statement supported all fees (not charged) and the hourly rate was consistent with local fees based on the complexities of the case and Movant's experience.

    No demand for payment of extensive fees were ever made to Complainant until after Complainant reneged on the contract and violated the trust placed in her by Movant.

d) Movant's evidence was "lost" by Informant and each Panel member although a copy was given each individually, (until directed otherwise by Informant).   Said so called missing evidence was not noticed by the Panel at the time of making its Findings of Facts and Conclusions of Law although the panel was to review the evidence and deliberate its findings.

e) Both the Hearing Panel and Supreme Court of Missouri disregarded the overwhelming evidence supporting the purchase price of Complainant's property by Movant based on several indicia of the

    market value but relied instead on the contract of the previous buyer that was shown by overwhelming evidence to have been offered only to bind the Complainant to the steps of foreclosure.

f) Informant blind sighted Movant with evidence not presented with Informant's list of exhibits prior to the hearings even though said evidence was in Informant's possession.

g) Based on questions from the Panel members related to the billing statement, it appeared that Informant and Panel members had engaged in ex-parte communications regarding evidence material to the case.

h) Informant omitted critical evidence from the proceedings that would refute his allegations including omitting Complainant's original complaint in the record submitted to the Supreme Court of Missouri and substituting it for a second, more generic complainant. The original complaint was replete with proven false allegations.

i) Informant presented testimony of a witness (the Complainant) he knew was false and not supported by the evidence.

j) Informant, perjured himself before the Supreme Court of Missouri while under oath as Missouri's new Chief Disciplinary Officer by making a statement of material fact that he knew was false when made.

k) Informant recklessly made other false statements before the Supreme Court of Missouri he knew was not supported by evidence.

    l) Gross disregard of the facts of the case, the credibility of Movant, Movant's extensive service to the Missouri Bar and the community that is contrary to any action of greed, fraud, or misrepresentation, including but not limited to serving on the boards of directors and in leadership capacities of The United Way of Metropolitan St. Louis (Committee Chair) The Scholarship Foundation, The Today and Tomorrow Foundation (Secretary), The Archdiocesan Pro-Life Committee (Co-Chair), The St. Louis Department of Health and Hospital, The St. Civil Right Enforcement Agency (Chair), the Missouri Catholic Conference, The St. Louis Archdiocesan Board of Education and Kenrick-Glennon Seminary.

    m) The Chief Hearing Officer failed to serve Movant with a copy of the Hearing Panel's Findings of Facts and Conclusions of Law and Recommendation of Discipline (suspension for three years) as required by Missouri Supreme Court Rule, the result of which would have been suspension of Movant's license by default under Supreme Court rule but for the recommendation of disbarment by Informant.

10) The decision of the Supreme Court of Missouri to suspend Movant's license was not supported by the weight of the evidence but by conjecture on the part of Informant and the false testimony of the Complainant.

 11) Movant has represented or counseled over 10,000 individuals in bankruptcy and non-bankruptcy matters for 23 years without incident of fraud or misrepresentation and has, more often than not, done so pro-bono or for fees that

would have otherwise, precluded representation.

12) Movant presented evidence that only months prior to representing Complaint, Movant resolved similar issues of property in foreclosure with as much or more equity than Complainant and Movant took no interest in either property but was able to avail the use of a Chapter 13 plan to protect the interest of her clients. Neither client, unlike Complainant, had exhausted their bankruptcy rights.

13) The order of suspension disregarding the fact raised by Movant that other options were available to Movant to benefit from Complainant's circumstances other than becoming mired in litigation, filing another bankruptcy without pay, taking a financial risk, or risking a bar complaint.

14) The manner in which the disciplinary process was applied to Movant for over three years was burdensome not only to Movant, but to Movant's clients who were unable to receive the immediate attention their cases required.  The suspension of Movant's license has deprived the community of an attorney who has diligently and competently provided pro-bono services and representation at reduced costs.  Clients continued to be adversely affected by the transfer of their file to other attorneys who are already burdened with their own case load.

15) The time and money consumed over the course of three years has resulted in the necessity of Movant resigning from several civic and charitable boards, and has resulted in the number of charities supported by Movant being reduced from 34 the year prior to encountering Complainant to four since encountering Complainant.  The amounts donated have been significantly reduced to those.

16) Movant's client was not only not harmed by Movant's representation but was

greatly benefited and in a manner that would not have been possible without Movant's dedication, diligence, competence and concern.

17) The Supreme Court of Missouri failed to recognize Movant's constitutional right to act on her religious beliefs in assisting a client in a manner consistent with the Missouri Rules of Professional Conduct and, at the same time to act on her religious beliefs to act prudently toward her own funds by providing for the possibility of compensation for the risk undertaken.

18) The Supreme Court of Missouri has denied Movant equal protection under the law by allowing other attorneys to be compensated for the risk taken under a contingency fee contract, but suspending Movant's license for providing for the potential of such contingent compensation consistent with the standard of fees charged under similar circumstances as indicated in a report by The Missouri Bar.

19) There is a pattern of selectively prosecuting complaints against African American attorneys in the State of Missouri and use of a statutory scheme of laws and rules that permit abuse of process in the prosecution of African American attorneys that results in a greater percentage of those attorneys being suspended or disbarred than that of their white counterparts.

20)  The Rules of Professional Ethics purported violated by Movant were never cited, analyzed or even read through any stage of the disciplinary Process including review by the Missouri Supreme Court.

21) Movant acted at all times within the Code of Professional Responsibility, and, in fact, upon the advice of The Missouri Bar's Legal Advisor, Sarah Rittman. Said advice was later embellished beyond her own notes when called upon to

testify, not on behalf of the "client" she advised but for the Missouri Bar by whom she is paid.